# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| CAROLINA BECERRA BECERRA; JULIO CESAR MARTINEZ MARTINEZ; MOISES SANTOS GONZALEZ; HERIBERTO VENTURA SATURNINO; ORLANDO VENTURA REYES; JOSE LUIS CORONADO; ALMA A. BECERRA; and ADELENE MENDOZA SOLORIO, | ) ) ) ) ) ) ) ) ) ) | No. 68528-7-I<br><br>DIVISION ONE |
| Appellants, | ) ) |  |
| v. | ) ) ) |  |
| EXPERT JANITORIAL, LLC, dba EXPERT JMS; and FRED MEYER STORES, INC., | ) ) ) ) ) | PUBLISHED<br><br>FILED: <u>September 16, 2013</u> |
| Respondents, | ) ) |  |
| ALL JANITORIAL, LLC; SERGEY CHABAN; ALL AMERICAN JANITORIAL, LLC; RAUL CAMPOS; and JANITORIAL MAINTENANCE & SUPPLY, LLC, dba JMS, | ) ) ) ) ) ) ) |  |
| Defendants. | ) ) |  |

COX, J. — The primary issue in this case of first impression is whether either Fred Meyer Stores, Inc. or Expert Janitorial, LLC is a "joint employer" of the appellant janitors under Washington's Minimum Wage Act (MWA). We hold that the proper test to determine this legal question is the "economic reality" test. That test requires examination of all factors relevant to the particular employment

situation to determine the economic reality of the relationship.[1] We also hold that there are genuine issues of material fact regarding the existence and degree of some of the relevant factors used to determine the economic reality of the plaintiff janitors' relationship with Fred Meyer and Expert, respectively. Accordingly, we reverse the summary judgment orders granting dismissal and remand for further proceedings.

In 2004, Fred Meyer, a large retail company with stores in Washington and other areas of the Pacific Northwest, began to outsource janitorial work that had previously been done by employees of the company. Several years later, the Puget Sound area Fred Meyer contracted with Janitorial Management Services (JMS), a company that later merged with Expert Janitorial, to provide janitorial services.

In the contract between Fred Meyer and Expert, Fred Meyer included a detailed outline of the cleaning tasks to be completed by the janitors working in

---

[1] See Rutherford Food Corp. v. McComb, 331 U.S. 722, 730, 67 S. Ct. 1473, 91 L. Ed. 1772 (1947) ("We think, however, that the determination of the [employment] relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity."); see also Torres-Lopez v. May, 111 F.3d 633, 641 (9th Cir. 1997) ("the inquiry must focus on the economic reality of the particular relationship between the [worker] and the alleged joint employer"); Bonnette v. Cal. Health and Welfare Agency, 704 F.2d 1465, 1469 (9th Cir. 1983) (noting that the "touchstone" of the determination of joint employment is its economic reality); overruled on other grounds by Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528, 538, 105 S. Ct. 1005, 83 L. Ed. 2d 1016 (1985); Moreau v. Air France, 356 F.3d 942, 947 (9th Cir. 2004) (examining all factors relevant to the particular employment situation to evaluate the economic reality of the relationship) ; Zheng v. Liberty Apparel Co. Inc., 355 F.3d 61, 71 (2d Cir. 2003) (noting that determination of the economic reality "is determined based upon all the circumstances" and should consider all relevant evidence "so as to avoid having the test confined to a narrow legalistic definition") (quoting Herman v. RSR Sec. Servs., Ltd., 172 F.3d 132, 139 (2d Cir. 1999)).

2

Fred Meyer stores. Expert, in turn, subcontracted with a variety of janitorial companies. These companies hired the janitors who cleaned the various stores with which Expert contracted.

One of the companies with which Expert contracted was All Janitorial, LLC, owned by Sergey Chaban. All Janitorial contracted with Expert to clean Washington Fred Meyer stores. All Janitorial's employees also cleaned Rite Aid stores in Washington for Expert, and it contracted with other companies like Expert to clean other stores in the area. During the janitors' employment, about half of All Janitorial's total revenues came from its contract to clean Fred Meyer stores. Marcos Flores was the principal supervisor for All Janitorial's workers. Carolina Becerra Becerra, Julio Cesar Martinez Martinez, Orlando Ventura Reyes, Alma A. Becerra, and Adelene Mendoza Solorio (collectively, "the janitors") all worked directly for All Janitorial.

All Janitorial hired the janitors and assigned them each to clean a particular Fred Meyer store in the Puget Sound region. The janitors signed contracts with All Janitorial which stated that they were "independent contractors."

Most janitors worked seven days a week. If they needed a night off, Flores directed them to find their own replacement.

The janitors worked overnight at Fred Meyer stores. Contractually, they were to work from 10:30 p.m. until 7:00 a.m. But the actual hours worked was a disputed issue in the trial court. The janitors testified that they typically worked from around 10:30 or 11:00 p.m. until 7:30, 8:00, or 8:30 a.m. They also stated

3

that in order to leave the stores in the morning, they were required to have a Fred Meyer employee sign off on an Expert-created checklist. This checklist was based on the contractual requirements outlined in the Fred Meyer-Expert contract.

In January 2010, All American Janitorial, LLC contracted with Expert to take over the janitorial work that All Janitorial had provided. All American was owned by Raul Campos, but he maintained Flores as the area supervisor. All American's only cleaning contract was with Expert for the Puget Sound Fred Meyer stores. Most of the janitors who worked for All Janitorial became All American employees. Only one of the janitors in this appeal continued to work for All American.

The janitors commenced this action against Expert, Fred Meyer, All Janitorial, Sergey Chaban, All American, and Raul Campos. They claim that the defendants violated the state MWA by failing to pay them the state minimum wage, failing to pay overtime for all hours worked in excess of 40 hours a week, and failing to provide rest and meal breaks. All Janitorial and its successor, All American, were their direct employers. The janitors claim that Expert and Fred Meyer were each their joint employers. The janitors seek amounts owed under the MWA, together with reasonable attorney fees, from Fred Meyer and Expert.

Both Expert and Fred Meyer moved separately for summary judgment. The trial court granted their respective motions.

The janitors appeal.

## JOINT EMPLOYERS

The janitors argue that the proper test to determine joint employer status under the MWA is the "economic reality" test that applies to the Fair Labor Standards Act (FLSA). They also argue that there are genuine issues of material fact regarding the existence and degree of some of the relevant economic reality factors determinative of joint employment that should have precluded the trial court's dismissal. We agree with both assertions.

A motion for summary judgment may be granted where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.[2] A material fact is one on which the outcome of the litigation depends.[3] "In a summary judgment motion, the moving party bears the initial burden of showing the absence of an issue of material fact."[4] If the moving party meets this burden, "the inquiry shifts to the party with the burden of proof at trial . . . ."[5] The nonmoving party must "'make a showing sufficient to establish the existence of an element essential to that party's case . . . .'"[6] To make a sufficient showing, "[t]he nonmoving party must set forth specific facts showing a

---

[2] CR 56(c).

[3] Elcon Constr., Inc. v. E. Wash. Univ., 174 Wn.2d 157, 164, 273 P.3d 965 (2012) (quoting Owen v. Burlington N. Santa Fe R.R., 153 Wn.2d 780, 789, 108 P.3d 1220 (2005)).

[4] Young v. Key Pharma., Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989).

[5] Id.

[6] Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)).

genuine issue and cannot rest on mere allegations."[7] Once the nonmoving party has made such a showing, "the evidence and all reasonable inferences therefrom is considered in the light most favorable to the plaintiff . . . ."[8]

An appellate court reviews an order granting a motion for summary judgment de novo, deciding "whether the affidavits, facts, and record have created an issue of fact and, if so, whether such issue of fact is material to the cause of action."[9]

Whether a joint employer relationship exists is a question of statutory interpretation.[10] "The court's 'fundamental objective when interpreting a statute is to discern and implement the intent of the legislature."[11]

Our state supreme court has repeatedly held that our courts may look to the federal courts' interpretation of the FLSA for guidance in interpreting the state MWA.[12] Most recently, in Anfinson v. FedEx Ground Package System, Inc., the

---

[7] Baldwin v. Sisters of Providence in Washington, Inc., 112 Wn.2d 127, 132, 769 P.2d 298 (1989).

[8] Young, 112 Wn.2d at 225-26.

[9] Seven Gables Corp. v. MGM / UA Entertainment Co., 106 Wn.2d 1, 12, 721 P.2d 1 (1986).

[10] See Anfinson v. FedEx Ground Package Sys., Inc., 174 Wn.2d 851, 866, 281 P.3d 289 (2012) (holding that under the MWA, the question of whether an employee was an independent contractor or an employee was a question of statutory interpretation).

[11] Id. (quoting Five Corners Family Farmers v. State, 173 Wn.2d 296, 305, 268 P.3d 892 (2011)).

[12] Id. at 867; Inniss v. Tandy Corp., 141 Wn.2d 517, 523, 7 P.3d 807 (2000).

supreme court reiterated that directive, stating "[t]he MWA was adopted in 1959. We have repeatedly recognized that the 'MWA is based on the Fair Labor Standards Act of 1938.'"[13] Thus, we look to the federal courts' application of the FLSA to the question of what constitutes joint employment to determine what constitutes such employment under the MWA, Chapter 49.46.

Under former RCW 49.46.010 (2010), to "'employ' includes to permit to work . . . ." Moreover, "An '[e]mployer' is any individual or entity 'acting directly or indirectly in the interest of an employer in relation to an employee.'"[14] And, an "employee" includes any individual employed by an employer.[15]

The FLSA provides that to "'employ' includes to suffer or permit to work."[16] As the supreme court recognized in Anfinson, "[t]he definitions of 'employee' and 'employ' are functionally identical under [the MWA and the FLSA.]"[17]

"The definition of 'employer' under the FLSA is not limited by the common law concept of 'employer,' and is to be given an expansive interpretation in order to effectuate the FLSA's broad remedial purposes."[18] Indeed, "[t]he FLSA's definition of employee has been called the 'broadest definition that has ever been

---

[13] Anfinson, 174 Wn.2d at 867.

[14] Id. at 867 (quoting former RCW 49.46.010(4) (2010)).

[15] Former RCW 49.46.010 (2010).

[16] 29 U.S.C. § 203(g).

[17] Id.

[18] Bonnette, 704 F.2d at 1469 (9th Cir. 1983) (quoting Real v. Driscoll Strawberry Assocs., 603 F.2d 748, 754 (9th Cir. 1979)).

included in any one act.'"[19] As the United States Supreme Court has recognized, the FLSA "'contains its own definitions, comprehensive enough to require its application to many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category.'"[20] Thus, "[t]he determination of whether an employer-employee relationship exists does not depend on 'isolated factors but rather upon the circumstances of the whole activity.'"[21]

Further, as our supreme court noted in Anfinson, both the MWA and the FLSA are remedial legislation.[22] "As remedial legislation, the MWA is given a liberal construction; exemptions from its coverage 'are narrowly construed and applied only to situations which are plainly and unmistakably consistent with the terms and spirit of the legislation.'"[23] As the United States Supreme Court said of the FLSA, "'the Act concerns itself with the correction of economic evils through remedies which were unknown at common law . . . .'"[24]

---

[19] Torres-Lopez, 111 F.3d at 638 (quoting United States v. Rosenwasser, 323 U.S. 360, 363 n.3, 65 S. Ct. 295, 89 L. Ed. 301 (1945)).

[20] Rutherford, 331 U.S. at 729 (quoting Walling v. Portland Terminal Co., 330 U.S. 148, 150-51, 67 S. Ct. 639, 91 L. Ed. 809 (1947)).

[21] Bonnette, 704 F.2d at 1469 (quoting Rutherford, 331 U.S. at 730).

[22] Anfinson, 174 Wn.2d at 870.

[23] Id. (quoting Drinkwitz v. Alliant Techsystems, Inc., 140 Wn.2d 291, 301, 996 P.2d 582 (2000)) (citations omitted).

[24] Rutherford, 331 U.S. at 727 (quoting Walling, 156 F.2d at 516).

Under the FLSA, two or more employers may jointly employ someone.[25]

A joint employment relationship exists:

> [w]here the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.[26]

Each joint employer is individually responsible for compliance with the requirements of the FLSA.[27] To comply with the FLSA an employer must pay its employees minimum wage and pay an increased salary for any hours of overtime worked.[28]

Whether an entity is a joint employer under the FLSA is a question of law.[29] We conclude that the same question under the MWA is also a question of law.

But, in determining whether an entity is a joint employer, "[t]he existence and degree of each factor is a question of fact . . . ." under the FLSA.[30] Likewise,

---

[25] Bonnette, 704 F.2d at 1469; see also 29 C.F.R. § 791.2 ("A single individual may stand in the relation of an employee to two or more employers at the same time under the [FLSA] . . . .").

[26] 29 C.F.R. § 791.2(b)(3).

[27] 29 C.F.R. § 791.2.

[28] RCW 49.46.020; RCW 49.46.140; 29 U.S.C. § 207(a)(1).

[29] Torres-Lopez, 111 F.3d at 638.

[30] See Anfinson v. FedEx Ground Package System, Inc., 159 Wn. App. 35, 46 n.19, 244 P.3d 32 (2010) (quoting Brock v. Superior Care, Inc., 840 F.2d 1054, 1059 (2d Cir. 1988)).

we conclude that the same rule applies to the existence and degree of the relevant factors under the MWA.

Here, Expert and Fred Meyer both agree that the economic reality test governs whether a joint employer relationship exists under the MWA. But primary disputes between them and the janitors includes what factors comprise this test and which are relevant to determining the "economic reality" of the alleged joint employment relationships in this case. Also at issue is whether there are genuine issues of material fact regarding the existence and degree of each such factor here.

All parties draw from the different factors applied by the United States Supreme Court and various federal circuit courts in arguing their respective positions in this case.[31] Despite the variety of factors enunciated by different

---

[31] See, .e.g., Rutherford, 331 U.S. at 730 (outlining a six-factor, non-exhaustive economic reality test); Zheng, 355 F.3d 61, 66-67, 72 (applying an economic reality test that examined six different factors, very similar to those outlined by the Rutherford court: (1) whether the employer's premises and equipment were used for the purported employees work; (2) whether the contractor corporation "had a business that could or did shift as a unit from one putative joint employer to another;" (3) the extent to which the purported employees performed a discrete line-job that was integral to the employer's process of production; (4) "whether responsibility under the contracts could pass from one subcontractor to another without material changes;" (5) the degree to which the employer or its agents supervised the purported employees work; and (6) whether the purported employees worked exclusively or predominately for the employers); Enterprise Rent-A-Car Wage & Hour Employment Practices Litigation v. Enterprise Holdings, 683 F.3d 462, 469 (3d Cir. 2012) (applying four factored test to determine status of entity as joint employer that analyzed the purported employers (1) power to hire and fire the purported employee; (2) its supervision and control of the employees; (3) its determination of the rate and method of payment; and (4) its control of employment records); Layton v. DHL Express (USA), Inc., 686 F.3d 1172, 1175-76 (11th Cir. 2012) (summarizing the six-factor test the Eleventh Circuit has developed); Dep't of Labor Opinion Letter,

federal circuit courts, all the federal courts as well as the federal Department of Labor agree that any one list of factors is not exclusive.[32] Rather, "The determination of an employment relationship [depends] . . . 'upon the circumstances of the whole activity.'"[33] This point is central to our disposition of this case.

We start with consideration of the seminal United States Supreme Court case addressing the question of joint employment under the FLSA, Rutherford Food Corp. v. McComb.[34] There, Kaiser Packing Company, a slaughterhouse, hired an experienced meat boner to "assemble a group of skilled [meat] boners to do the boning at the slaughterhouse."[35] "The terms of the contract were that [the meat boner supervisor] should be paid for the work of [meat] boning . . . that Kaiser would furnish a room in its plant for the work . . . [and] that Kaiser would also furnish [the] barrels for the boned meat . . . ."[36]

---

2001 WL 1558966 (outlining six factors that the DOL believes make up the economic reality test).

[32] See Moreau, 356 F.3d at 947 (noting that it had previously considered a "non-exhaustive" list of factors in assessing joint employment); Barfield v. New York City Health and Hospitals Corp., 537 F.3d 132, 142-43 (2d Cir. 2008) ("In so holding . . . we emphasized that '[n]o one of these factors is dispositive,' nor were they, as a whole, 'exclusive.'") (quoting Brock v. Superior Care, Inc., 840 F.2d 1054, 1058-59 (2d Cir. 1988)); Dep't of Labor Opinion Letter, 2001 WL 1558966.

[33] Itzep v. Target Corp., 543 F. Supp. 2d 646, 652 (W.D. Tex. 2008) (quoting Rutherford, 331 U.S. at 730).

[34] 331 U.S. 722, 67 S. Ct. 1473, 91 L. Ed. 1772 (1947).

[35] Id. at 724.

[36] Id. at 724-25.

The original supervisor eventually left and the work was first taken over under an oral contract by another meat boner followed by two other individuals over the course of a year.[37] The meat boners owned their own tools.[38] The court also noted that the "slaughterhouse operations, of which the [meat] boning is a part, are carried on in a series of interdependent steps."[39] It was also "undisputed that the president and manager of Kaiser" observed the meat boning process several times a day and corrected the meat boners' cuts frequently.[40]

The Supreme Court held that the meat boners were joint employees of Kaiser, who owned the slaughterhouse.[41] In so holding, the court identified six relevant factors:

> [T]he workers did a specialty job on the production line. The responsibility under the [meat] boning contracts without material changes passed from one [meat] boner to another. The premises and equipment of Kaiser were used for the work. The group had no business organization that could or did shift as a unit from one slaughterhouse to another. The managing official of the plant kept close touch on the operation. While profits to the [meat] boners depended upon the efficiency of their work, it was more like piecework than an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor.[42]

---

[37] Id. at 725.

[38] Id.

[39] Id.

[40] Id. at 726.

[41] Id. at 730.

[42] Id.

12

The Court also made clear that the evaluation of whether an employment relationship existed rested "upon the circumstances of the *whole activity*."[43] This wording indicates that the test is flexible and depends on the totality of the circumstances of each case.[44]

In Torres-Lopez v. May, the Ninth Circuit examined all six of the Rutherford factors, as well as others it determined were relevant to assessing the economic reality of the employment relationship in that case.[45] Thus, central to the Torres-Lopez test is the doctrine that "[a] court should consider all those factors which are 'relevant to [the] particular situation' in evaluating the 'economic reality' of an alleged joint employment relationship under the FLSA."[46]

There, the Ninth Circuit considered joint employment in the agricultural setting, examining the FLSA and the Agricultural Worker Protection Act (AWPA). The court pointed out that "'employ' has the same meaning under the AWPA as under the FLSA."[47] The court then looked to five factors expressed in the AWPA regulations to help it assess joint employment for farmworkers.[48] These factors are:

---

[43] Id. (emphasis added).

[44] Moreau, 356 F.3d at 950.

[45] 111 F.3d 633, 639-40 (9th Cir. 1997).

[46] Id. at 639 (some alterations in original) (quoting Bonnette, 704 F.2d at 1470).

[47] Id. at 639.

[48] Id. at 639-40.

(A) The nature and degree of control of the workers;
(B) The degree of supervision, direct or indirect, of the work;
(C) The power to determine the pay rates or the methods of payment of the workers;
(D) The right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; [and]
(E) Preparation of payroll and the payment of wages.[49]

The Torres-Lopez court also examined eight other factors it deemed important for assessing joint employment.[50] The court took the first six Rutherford factors and then added two factors that it had previously outlined in Real v. Driscoll Strawberry Associates, Inc.[51]

The factors outlined by the Torres-Lopez court were: (1) whether the work was a "specialty job on the production line"; (2) whether responsibility between a labor contractor and an employer pass from one labor contractor to another without material changes; (3) whether the "premises and equipment of the employer are used for the work"; (4) whether the employees had a "business organization that could or did shift as a unit from one [worksite] to another"; (5) whether the work was "piecework" as opposed to work that required "initiative, judgment or foresight"; (6) whether the employee had an "opportunity for profit or loss depending upon [the employee's] managerial skill"; (7) whether there was

---

[49] Id. (quoting 29 C.F.R. § 500.20(h)(4)(ii)).

[50] Id.

[51] 603 F.2d 748 (9th Cir. 1979).

"permanence [in] the working relationship"; and (8) whether "'the service rendered is an integral part of the alleged employer's business . . . .'"[52]

The Torres-Lopez court explained that these eight "factors play an important role in revealing the economic reality" of the employment relationship.[53] They demonstrate "whether a [worker] is economically dependent on the alleged joint employer."[54] The court thus emphasized, again, that what factors were important in a particular employment situation depended on which revealed the economic reality of the working relationship.[55]

In its most recent opinion addressing joint employment, Moreau v. Air France,[56] the Ninth Circuit analyzed all thirteen of the Torres-Lopez factors, looking to both the Torres-Lopez opinion and to an earlier Ninth Circuit joint employment case, Bonnette v. California Health and Welfare Agency.[57] The Moreau court recognized that the four factors outlined in Bonnette "roughly correspond to" the five Torres-Lopez factors borrowed from the AWPA.[58] It then

---

[52] Torres-Lopez, 111 F.3d at 640 (quoting Rutherford, 331 U.S. at 730; Real, 603 F.2d at 754).

[53] Id.

[54] Id. at 636.

[55] See id. at 641 (noting that "[t]he issue is not whether [an employee] is *more* dependent upon the [one employer or another]. Rather, the inquiry must focus on the economic reality of the particular relationship between the [employee] and the alleged joint employer").

[56] 356 F.3d 942 (9th Cir. 2004).

[57] 704 F.2d 1465 (9th Cir. 1983).

[58] Moreau, 356 F.3d at 950.

acknowledged that examining only these, without the other eight enunciated by Torres-Lopez, was too limited an analysis to uncover the economic reality of the employment situation.[59] "[T]he district court's focus on the four Bonnette factors appear[ed] a bit narrow . . . ."[60] Thus, the Ninth Circuit confirmed that to properly analyze joint employment, a court must examine *all* those factors that are relevant to the particular situation and aid in evaluating the economic reality of the alleged joint employment relationship.[61]

Here, the trial court, in ruling on both summary judgment motions, limited its consideration of relevant factors to those stated in Bonnette. Doing so constitutes reversible error.

In its order granting Fred Meyer's motion for summary judgment, the trial court acknowledged that it focused on only the Bonnette factors, rather than also examining those enunciated in Torres-Lopez. It reasoned as follows:

> because the [Torres-Lopez] factors seem to apply more to the [Moreau] case and that type of thing. The production line is one of the things they talk about. And also they seem to find more where the plaintiff's work is an integral part of business.
>
> I know the plaintiffs are asserting that the janitorial work is integral at Fred Meyer, but . . . [i]t's not an integral part of their business.

---

[59] Id. ("[T]he Bonnette considerations are overly restrictive in the FMLA joint employer context, as an 'indirect' or 'secondary' employer will almost never satisfy these criteria, which are more the responsibilities of the 'primary' employer.").

[60] Id. at 953.

[61] Id.

So that is why I think I focused more on the Bonnette factors, and particularly the factors that we are all discussing today, which is the issue of control over the employees . . . ."[62]

Additionally, in its order granting Expert's motion for summary judgment, the court stated that "[t]here is no genuine issue of material fact on the issue of whether Expert was Plaintiffs' joint employer . . . . Specifically, the Court concludes that Expert was not Plaintiffs' joint employer under the test set forth in Bonnette . . . ."[63]

By limiting its analysis to the Bonnette factors, the trial court not only disregarded the expansive nature of the definition of employment under the FLSA and MWA, but it also ignored the factors the United States Supreme Court enunciated in Rutherford.[64] Further, it failed to address the broad language of the Ninth Circuit and other federal circuits regarding the factors to be applied to determine joint employment.[65] Thus, the trial court's limited examination was incorrect.

There is an additional reason that the trial court's limited analysis of the janitors' employment relationship with Fred Meyer and Expert was incorrect. The trial court indicated that it limited its analysis to the Bonnette factors in part because it felt the other factors applied more to "production line" type jobs. But

---

[62] Report of Proceedings (Sept. 2, 2011) at 36-37.

[63] Clerk's Papers at 2263.

[64] See Moreau, 356 F.3d at 953 (noting that the district court's focus on the Bonnette factors "appears a bit narrow"); Rutherford, 331 U.S. at 730.

[65] See Moreau, 356 F.3d at 953.

we live in an economy that is shifting away from production line jobs. As the Bureau of Labor Statistics noted recently, "[t]he majority of output growth [in the economy] is projected to come from the service-providing sectors."[66] If our courts were to limit their full examinations of potential joint employment relationships to "production line" jobs, employers in the fastest growing sectors of our economy would be insulated from complying with the requirements of the MWA and FLSA. This runs counter to the remedial purposes of both acts.

Expert argues that the trial court *did* consider factors outside those outlined in Bonnette, but this is belied by the record, as we just discussed.

Expert also asserts that the correct joint employment test to determine the economic reality as to joint employment is, primarily, the Bonnette factors. Fred Meyer contends that *only* the Bonnette test need be applied, arguing that additional factors considered by other courts "do not apply to 'run-of-the-mill subcontracting relationships.'"[67] But neither argument is correct, as our above analysis makes clear.

Additionally, Expert argues that the janitors waived any right to argue that both the Bonnette and Torres-Lopez factors are important when assessing the existence of joint employment. Expert contends that the janitors agreed with its limited framing of the joint employment factors that should be applied.

---

[66] Henderson, Richard, Employment Outlook: 2010-2020 – Industry Employment and Output Projections to 2020 available at http://www.bls.gov/opub/mlr/2012/01/art4full.pdf (last visited on 8/6/2013)).

[67] Respondent/Defendant Fred Meyer's Appeal Brief at 29-31 (quoting Zheng, 355 F.3d 61 at 74).

This argument is not supported by the record. In its opposition to Expert's Motion for Summary Judgment, the janitors stated:

Plaintiffs . . . disagree with defendant's assertion that:

'Under the FLSA, courts determine whether a particular entity is a joint employer using the 'economic reality' test described in Bonnette . . . .'

The Ninth Circuit test relied upon by Expert began with Bonnette . . . . However, the Ninth Circuit in Torres-Lopez . . . and Moreau . . . made it clear that the Bonnette analysis was not limited to the four [Bonnette factors].[68]

Thus, before the trial court, the janitors argued that to properly assess the economic reality of the janitors' relationship with Expert, the trial court had to look beyond those factors stated in Bonnette.

Finally, Expert argues that failure to meet any of the Bonnette factors is conclusive that there is no joint employment relationship, and a court need not look to the Torres-Lopez factors. This is not the law. As we explained previously in this opinion, a court must examine all relevant factors that may reveal the economic reality of the employment relationship.[69]

---

[68] Clerk's Papers at 2025-26.

[69] See Moreau, 356 F.3d at 953; Zheng, 355 F.3d at 69 (noting that while the Bonnette factors "can be *sufficient* to establish employer status[,] . . . a positive finding on those four factors is [not] *necessary* to establish an employment relationship."); Barfield, 537 F.3d at 143 (noting with approval the court's prior holding in Carter v. Dutchess Community College, that, "while satisfaction of the four factors . . . 'can be *sufficient* to establish employ[ment] status,' we [have] never held 'that a positive finding on those four factors is *necessary* to establish an employment relationship.'" (quoting Carter v. Dutchess Community College, 735 F.2d 8, 69 (2d Cir. 1984))).

Fred Meyer argues that this court should not look to cases that involve an examination of the Agricultural Workers Projection Act, such as Torres-Lopez. It relies on an Eleventh Circuit case, Layton v. DHL Express (USA), Inc., for this assertion.[70] But the court in Layton explicitly adopted the factors outlined in a case that examined **both** the AWPA and the FLSA.[71] Thus, Layton does not support Fred Meyer's arguments that cases, such as Torres-Lopez, involving FLSA **and** AWPA should not be considered here.

Further, as the federal district court stated in Lemus v. Timberland Apartments, LLC, the first five Torres-Lopez factors are not only applicable in AWPA cases.[72] "In fact, many of the cases relied upon by [the defendant] are non-AWPA cases where the courts investigate indirect control. . . . Moreover, the text of the FLSA and its implementing regulations both require courts to consider indirect control in determining whether an entity is an employer."[73]

Fred Meyer also argues that the janitors "confuse the economic reality test for joint employment with [that used in] independent contractor cases." It is true that many of the factors outlined by the Torres-Lopez court also apply to differentiating between independent contractors and employees.[74] But this does

---

[70] 686 F.3d 1172 (11th Cir. 2012).

[71] Id. at 1177.

[72] 2011 WL 7069078, at 9 (Dec. 21, 2011).

[73] Id.

[74] See United States v. Silk, 331 U.S. 704, 67 S. Ct. 1463, 91 L. Ed. 1757 (1947) (considering factors such as degree of control, opportunities for profit or

not mean that these factors are inapplicable here, or that they should not be examined to help a court assess the economic reality of the relationships here.

The janitors argue that, because all defendants deny being her employer, the independent contractor test developed in Anfinson is also applicable here. But the real question is whether either or both of these employers was a joint employer. The defendants' denials of joint employment do not alter the legal question before this court.

The janitors also contend that this court should examine all the factors enunciated by various federal appellate courts, as well as those outlined by the DOL, to determine whether either Fred Meyer or Expert is a joint employer. Our holding is that the trial court's consideration of relevant factors was too narrow. On remand, the trial court shall consider what factors are appropriate to determine the economic reality of the parties' relationship.

*Status of Fred Meyer*

The janitors argue that the trial court erred when it granted Fred Meyer's motion for summary judgment, determining as a matter of law that it was not a joint employer. While they conceded that Fred Meyer did not maintain the janitors' employment records, they argue that there were genuine issues of material fact with respect to all other factors. We substantially agree.

Here, the janitors presented sufficient evidence to create genuine issues of material fact with respect to at least two factors: Fred Meyer's indirect

---

loss, investment in facilities, permanency of work, and skill required in assessing whether individual is employee or independent contractor).

21

supervision and control of their work and its control of their employment conditions. Further, Fred Meyer conceded, as it had to, that the janitors worked at Fred Meyer stores, and thus that its "premises and equipment"[75] were used for the janitors work. Because the joint employment test is not one of tallying factors, but one designed to analyze the true economic reality of the employment arrangement, the genuine issues of material fact with respect to these factors were sufficient to withstand summary judgment.

Fred Meyer does not contest, nor can it, that the janitors' work was done at a Fred Meyer's store, where Fred Meyer employees were better able than Expert or All Janitorial to "prevent labor law violations." Though Fred Meyer delegated hiring and supervisory responsibilities to others to "focus on the 'core competency' of directing retail operations," the system in place still meant that the janitors worked at Fred Meyer stores and were supervised by Fred Meyer employees. Thus, as in Torres-Lopez, Fred Meyer was in the best position to observe the janitors' work. Further, as in Torres-Lopez, Fred Meyer invested in equipment that the janitors used. These facts create genuine issues of material fact as to Fred Meyer's position as a joint employer.

Fred Meyer was the organization that came closest to supervising the janitors on a day-to-day basis. The supervision and control factor is not necessarily a question of direct supervision, but of indirect supervision and control.[76] As the district court in Lemus noted, "the text of the FLSA and its

---

[75] See Torres-Lopez, 111 F.3d at 640.

[76] See Lemus v. Timberland Apartments, LLC, 2011 WL 7069078, at * 9.

implementing regulations both require courts to consider indirect control in determining whether an entity is an employer."[77]

> In Lemus, the court held that Polygon, the purported joint employer,
>
> exerted indirect control through a combination of setting the master construction schedule, dictating permissible work hours, providing and managing the flow of necessary construction materials, and supervising JC Builders' framing work in a manner that undercut JC Builders' ability to manage the daily tasks of its employees.[78]

This indirect control is akin to that exerted by Fred Meyer here.

As the janitors note, every janitor testified that she or he was supervised by a Fred Meyer employee. One explained this belief, noting that "[b]ecause [at] the time . . . [when] we were supposed to leave [a Fred Meyer manager or employee] would take the form from me. They would go with me through all the store, and they would not let me go until they would sign the order, the form."[79] And, multiple janitors testified that, though they might contact Marcos Flores, the All Janitorial supervisor, when the equipment broke down, he rarely came into the store to supervise their work. Thus, there was a genuine issue of material fact whether Fred Meyer employees or managers had indirect supervision and control of the janitors' work.

Further supporting Fred Meyer's indirect control of the employers is its indirect control over firing or modifying the janitors' employment. Evidence from

---

[77] Id. (citing 29 U.S.C. § 203(d) and 29 C.F.R. § 791.2(b)).

[78] Id. at *10.

[79] Clerk's Papers at 351, 385-86, 1032 ("Our shift was supposed to end at 7:00 in the morning, but we could not go home until our Fred Meyer manager inspected our work, we made any corrections and they signed us out.").

23

the janitors create a genuine issue of material fact with respect to Fred Meyer's indirect power to alter the janitors' employment. Chaban, the owner of All Janitorial, testified that Expert told him "there should be personnel changes as a result of dissatisfaction" on the part of either Expert or Fred Meyer. An e-mail between Chaban and an Expert employee reflected that employment changes were requested by Fred Meyer. And, when janitors were caught stealing Fred Meyer merchandise and its security guards trespassed those individuals from the store, Fred Meyer would contact Expert and instruct it to remove the janitor from working in its stores. Expert then relayed the message to All Janitorial, "telling it that the janitor can no longer work on the Fred Meyer contract."[80] At the very least, this request from Fred Meyer, communicated through Expert, resulted in an alteration of a janitor's employment situation.

There is also evidence in the record that may create genuine issues of material fact with respect to several other factors, including the permanence of the janitors' employment at Fred Meyer and whether the janitors' work required initiative, judgment, or foresight.[81] We defer to the trial court on remand to consider this evidence.

We do note, however, that given that the factors we have enunciated are a non-exhaustive list, the trial court may examine other factors, not previously applied, in determining whether Fred Meyer was a joint employer of the janitors.

---

[80] Id. at 71.

[81] Id. at 1222, 1233, 1988, 2068 (acknowledging that "the work performed by plaintiffs did not require significant initiative and judgment").

Specifically, it may analyze whether the evidence presented by the janitors supports their assertion that the system of employment adopted here is a "subterfuge or sham structure [meant] to avoid FLSA obligations."[82] Here, Fred Meyer's potential knowledge of the janitors' overtime work and the possibility that the two tiered contractor model was adopted to save money and avoid compliance with fair labor laws are potentially demonstrative of such a sham.

Fred Meyer persuasively argues that the janitors failed to present genuine issues of material fact regarding any relevant factors. First, it contends that it did not indirectly supervise the janitors, arguing that it "paid Expert to clean its stores, so its store directors and other supervisors could focus on Fred Meyer's core mission: retail sales." But, as the testimony of the janitors demonstrates, even if this was the original intention of outsourcing the work of the janitors, it is a genuine issue of material fact whether the janitors were, in the end, supervised by Fred Meyer. Though Fred Meyer points out that All Janitorial trained the janitors, assigned them to the store, and transferred them if that need occurred, these facts do not negate the testimony of the janitors regarding daily supervision by Fred Meyer.

Fred Meyer also argues that because the janitors only interacted with Fred Meyer employees only after they had finished cleaning, its employees were not technically supervisors. It notes that its "night stockers repeatedly reported seeing janitors sleeping in Fred Meyer stores, but Fred Meyer store directors did nothing about these complaints." Instead of supervision, Fred Meyer employees

---

[82] Barfield, 537 F.3d at 145-46 (citing Zheng, 355 F.3d at 72, 76).

were providing "contractual warranties of quality and time of delivery" which has "no bearing on the joint employment inquiry."[83]

We disagree. Here, there is testimony in the record that the janitors could not leave for the day until the Fred Meyer managers approved the work they had done. Thus, this supervision altered the hours the janitors were expected to work. For purposes of summary judgment, this should not be considered as merely "maintaining compliance with contractual warranties." Nor should the fact that the janitors were allowed to "sleep on the job" matter if the janitors could be detained by Fred Meyer managers before they could leave in the morning. This is particularly true where there were no other employers supervising the janitors' day-to-day work.

Finally, the trial court, in granting its motion for summary judgment, found it important that none of the janitors could name the Fred Meyer employees who checked their work, and that none of the Fred Meyer store managers spoke Spanish, while all the janitors did. But neither of these factors negates the genuine issues of material fact as to Fred Meyer's supervision.

Not knowing the name of an individual or not speaking the same language does not preclude supervision. As testimony in the record indicated, the janitors and managers would communicate through rudimentary words and signals, which was sufficient to communicate what areas needed to be cleaned further before the janitors departed.

---

[83] Id. Respondent/Defendant Fred Meyer's Appeal Brief at 37 (quoting Zheng, 355 F.3d at 75).

Nor was it imperative, or even demonstrative of the lack of a joint employment relationship, that the janitors did not know the Fred Meyer employees' names. Some did not know Marcos Flores or Chaban's names, either, but it is not disputed that their organization, All Janitorial, employed the janitors.

As to its indirect ability to alter the janitors' employment, Fred Meyer argues that any requests that All Janitorial or All American remove janitors from working at its stores does not amount to indirect control to fire or alter the employment conditions of a worker. It points to the fact that if it had caught other Fred Meyer employees stealing merchandise, these employees would have been treated differently than the janitors were treated. But, just because Fred Meyer treated its employees differently does not negate the genuine issue of material fact the janitors present regarding Fred Meyer's indirect control of their employment.

Fred Meyer also points to the testimony of a former Fred Meyer manager stating that in some instances, janitors who had stolen merchandise from one Fred Meyer store were then transferred by All Janitorial to another Fred Meyer location. In view of the evidence discussed above, this particular evidence does not eliminate the existence of a genuine issue of material fact.

Fred Meyer highlights the testimony that All Janitorial or All American fired four janitors. It asserts that this testimony indicates that there is no genuine issue of material fact as to Fred Meyer's control of the janitors' working conditions. But the fact that the Fred Meyer's requests were communicated

27

through another organization does not mean that its indirect control of the janitors' employment is not a genuine issue of material fact.

Fred Meyer also argues, for the first time on appeal, that the testimony of one of the janitors, Alma Becerra, regarding her termination is inadmissible hearsay and thus may not be considered. Because Fred Meyer did not raise this argument below, it is procedurally barred.[84]

Fred Meyer also contends that a recommendation as to firing an individual does not amount to control over hiring and firing. It relies on Lepkowski v. Telatron Marketing.[85] There, the district court concluded that the amended complaint did:

> not allege . . . or even inferentially support the contention that [Bank of America] itself posses[ed] the power to discipline Telatron employees . . . .
>
> . . .
>
> In the absence of any allegation that [Bank of America] had any control over the hiring and firing of Telatron employees, this factor cuts against joint [employment].[86]

But, the federal district court's interpretation of this factor is more restrictive than that expressed by the Ninth Circuit in Torres-Lopez. There, the court stated that "[t]he district court did not attribute much significance to [the supervision of the farmworkers] because it concluded that any control exercised by Bear Creek Farms was exercised indirectly. The regulations expressly state, however, that indirect control as well as direct control can demonstrate a joint employment

---

[84] RAP 9.12.

[85] 766 F. Supp. 2d 572, 578 (W.D. Pa. 2011).

[86] Id.

28

relationship."[87] Though this was in the context of the AWPA regulations, the Department of Labor expressed in its 2001 opinion letter that this rationale also applies to FLSA cases.[88] There, the DOL asked whether an employer had the power, whether alone, jointly, directly, or indirectly "to hire or fire or modify the employment conditions of the individual . . . ."[89] Thus, Fred Meyer's argument fails.

Finally, Fred Meyer argues that its decision to contract out its janitorial work is the "legitimate type of subcontracting arrangement" allowed under the FLSA and the MWA.[90] But, the janitors presented sufficient evidence to create a genuine issue of material fact for the trial court as to this potential factor.

*Status of Expert*

The janitors argue that the trial court erred when it concluded, primarily on the basis of the Bonnette factors, that Expert was not their joint employer as a matter of law. While the janitors conceded that Expert did not maintain employment records, or determine the janitors' rate and method of payment, they argue that there are genuine issues of material fact with respect to all other factors. Because the trial court erred by limiting its analysis of whether a joint employment relationship existed to four factors, and because there are genuine

---

[87] Torres-Lopez, 111 F.3d at 642-43.

[88] Dep't of Labor Opinion Letter, 2001 WL 1558966.

[89] Id.

[90] Respondent/Defendant Fred Meyer's Appeal Brief at 41 (citing Zheng, 355 F.3d at 72).

issues of material fact with respect to a number of the relevant joint employment factors, we agree.

First, Expert concedes the existence of several factors, one of which is that the janitors' work was an integral part of its janitorial business. This is significant. As the United States Supreme Court stated in Rutherford, "[w]here the work done, in its essence, follows the usual path of an employee, putting an 'independent contractor' [or non-employee] label does not take the worker from the protection" of the FLSA.[91]

Second, Expert also acknowledged that the janitors' work required little initiative, judgment, or foresight, and that the janitors had little opportunity for profit or loss.

Third, as with Fred Meyer, there is a genuine issue of material fact whether Expert had the power to fire or alter the employment conditions of All Janitorial and All American workers.

Chaban, the owner of All Janitorial, testified as follows:

> Q: Was it ever communicated to you, either directly by Fred Meyer, by Susan [Vermeer, Expert's western regional Vice President] or by the district managers, that there should be personnel changes as a result of dissatisfaction?
>
> A: Yes.
>
> Q: Can you give me . . . an example of how that would happen and what happened then.
>
> A: If something would be stolen, I would be asked to replace the personnel. They didn't show up. Or just a bad job, continuously.

---

[91] Rutherford, 331 U.S. at 729.

30

Q: And when you were asked to do it, did you take that to be simply a suggestion or did you think it was stronger than a suggestion?

A: Stronger.

Q: And typically, if it were suggested that a person be let go, was it your practice, then, to let them go?

A: Yes.[92]

The record includes an email exchange between Vermeer and Chaban that supports Chaban's testimony.[93] Vermeer emailed Chaban to request that he "do what ever [sic]" he had to stop the theft of Fred Meyer merchandise by janitors.[94] Chaban replied,

Susan, thank you for understanding this. We called an emergency meeting today with all FM people to talk about this issue. I will also create a black list of people that are non hirable to make sure these people never come back to FM stores or any other in my company for that matter.[95]

Vermeer then responded:

I really appreciate what you are trying to do. . . . Please forward me your black list so I can help assure these people are also not getting hired by any other [service provider] in our market. thanks [sic] again. I am told the guy at shelton [sic] signed a pay note for over 3000![96]

---

[92] Clerk's Papers at 238.

[93] Id. at 1395-96.

[94] Id. at 1396.

[95] Id. at 1395.

[96] Id.

31

This exchange creates a genuine issue of material fact as to Expert's control over firing or altering the employment conditions of the janitors.

Fourth, there was a genuine issue of material fact whether the janitors' employment was "permanent," as that word is defined by Black's Law Dictionary.[97] "Permanent employment" is defined as "Work that, under a contract, is to continue indefinitely until either party wishes to terminate it for some legitimate reason."[98] There was no evidence in the record that the janitors' work for Expert was limited to a specific amount of time. Thus, the permanency of their employment is a genuine issue of material fact.

Finally, the janitors presented evidence that the contract between Expert and the janitors' direct employer passed "from one subcontractor to another without material changes"[99] when the contract shifted from All Janitorial to All American.

Because the janitors were able to produce sufficient evidence to create genuine issues of material fact as to the economic reality of their employment relationship with Expert, the trial court erred in granting Expert's motion for summary judgment.

Expert argues that, because all the janitors testified that Marcos Flores fired them, any other testimony as to its indirect control to alter the janitors' employment is negated. Though Flores communicated the decision of who to

---

[97] BLACK'S LAW DICTIONARY (5th ed. 1979) at 605.

[98] Id.

[99] Zheng, 355 F.3d at 74.

fire to all janitors, this does not explain *who* made the employment decisions. And the email exchange between Chaban and Vermeer belies Expert's claim that "[t]he Service Provider is free to move the janitor to work on other contracts it has with other customers."[100]

Vermeer and Expert dispute whether Vermeer or any other Expert supervisors directed All Janitorial to fire or alter the employment conditions of the janitors. But such a dispute constitutes a genuine issue of material fact that should not be resolved on summary judgment.

Expert also argues that the fact that it "passed along Fred Meyer requests to remove particular workers from the contract" does not amount to the power to fire or alter employment conditions. It cites Flores v. Albertson's, Inc. to support this proposition. Flores is an unpublished case, so we do not consider it any further.[101] In any event, as we have previously noted, *indirect* ability to fire should be examined as well as a direct ability.[102]

Expert argues, relying in part on Zheng v. Liberty Apparel Co., Inc.,[103] that the factor regarding the initiative and judgment required of a job is truly an examination of whether a job is "piecework." Thus, it argues it is more useful for

---

[100] Brief of Respondent Expert, LLC at 22.

[101] See GR 14.1(b).

[102] Dep't of Labor Opinion Letter, 2001 WL 1558966 (2001); see also Layton, 686 F.3d at 1176 (applying the factors, including "[t]he right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers . . . .").

[103] 355 F.3d 61 (2d Cir. 2003).

determining whether employees are independent contractors or employees.[104]

But, as noted above, the Zheng court concluded that this factor could be

significant if:

> plaintiffs can prove that, as a historical matter, a contracting device has developed in response to and as a means to avoid applicable labor laws, the prevalence of that device may, in particular circumstances, be attributable to widespread evasion of labor laws.[105]

Because the janitors produced evidence that at least created a genuine issue of

material fact as to this layered subcontracting practice being an attempt to evade

labor laws, Expert's argument is not persuasive for purposes of summary

judgment.

Expert also contends that the janitors "concede that they did not perform

'a specialty job on the production line,'" but it does not cite to any actual

concession made by the janitors.[106] We reject this unsupported argument.

Additionally, Expert argues that the janitors' work was not permanent

because the "length of time Plaintiffs worked . . . varied widely from Plaintiff to

Plaintiff, ranging from just nine weeks to 18 months . . . ."[107] But this factor

appears to be an examination not of how long one worker stayed in a position,

but how long it was *possible* for that worker to do so. Thus, in Torres-Lopez, the

---

[104] Brief of Respondent Expert Janitorial, LLC at 32 (citing Zheng, 355 F.3d at 67-68).

[105] Zheng, 355 F.3d at 73-74.

[106] Brief of Respondent Expert Janitorial, LLC at 29.

[107] Id. at 33.

court agreed with the district court that there was no permanence in the working relationship "because the farmworkers only harvested for Bear Creek Farms for thirty-two days in 1992."[108] There, it appears that the harvest season was limited to thirty-two days.

Here, however, unlike an independent contractor, the janitors were hired to work indefinitely as janitors. Consequently, the variation in length of time each individual plaintiff worked does not invalidate the evidence presented to meet this factor.

Expert argues that its concession that the janitors' work was integral to its business "does not outweigh the numerous significant factors discussed above, which weigh heavily against finding a joint employer relationship."[109] But, as we have previously noted, the test for joint employment is not meant to be one of tallying up which factors support or do not support such a relationship. Rather, the factors should be analyzed to help determine the economic reality of the relationship. Thus, Expert's argument is unconvincing particularly in the context of summary judgment.

## EVIDENCE ON SUMMARY JUDGMENT MOTIONS

Fred Meyer and Expert argue that we should not consider portions of the record on appeal. Because the trial court considered both the declaration and

---

[108] Torres-Lopez, 111 F.3d at 644.

[109] Brief of Respondent Expert Janitorial, LLC at 34 (quoting Moreau, 356 F.3d at 952).

deposition to which they object and there is no merit to their arguments, we disagree.

First, Fred Meyer argues that the declaration of John Ezzo, the janitors' expert on outsourcing in the janitorial industry, is inadmissible. Fred Meyer did not move to strike Ezzo's declaration in the trial court. "Failure to make such a motion waives deficiency in the affidavit if any exists."[110] Thus, it did not preserve below any objection to admissibility of that document.

Additionally, Fred Meyer did not cross appeal the court's admission of that document, a decision adverse to its interest below. Thus, Fred Meyer has waived any argument as to the admissibility of Ezzo's declaration.

Second, Expert also argues that we should disregard Ezzo's declaration because he makes no showing that he is an expert and his declaration has nothing "to do with the joint employment issue . . . ."[111] But Expert also failed to move to strike the declaration below. Likewise, it did not cross appeal the admissibility of that document. For these reasons, Expert has also waived any argument as to the admissibility of that document.

Finally, Expert argues that one of Chaban's depositions should also be disregarded because the janitors obtained it without providing Expert notice. The trial court reviewed this argument and rejected it. As with Expert's argument regarding Ezzo's declaration, its argument regarding Chaban's deposition was

---

[110] Lamon v. McDonnell Douglas Corp., 91 Wn.2d 345, 352, 588 P.2d 1346 (1979).

[111] Brief of Respondent Expert Janitorial, LLC at 35-36.

waived because it did not cross appeal the trial court's decision. Thus, Chaban's deposition is properly before this court.

## OTHER MATTERS

### *Motions to Designate Additional Clerk's Papers*

We also have before us various motions and arguments that we should allow the designation of additional clerk's papers to the record on appeal. For the following reasons, we deny all these motions.

Expert moved, pursuant to RAP 9.6 and 9.10, to designate additional clerk's papers. Under RAP 9.6(a), "a party may supplement the designation [of clerk's papers] only by order of the appellate court, upon motion." Additionally, under RAP 9.10, "[i]f the record is not sufficiently complete to permit a decision on the merits of the issues presented for review," a party may move to supplement the record. However, RAP 9.12 provides that "[o]n review of an order granting or denying a motion for summary judgment the appellate court will consider only evidence and issues called to the attention of the trial court."

Here, Expert has submitted two motions to designate specific sections of the court record from Lucio, et al. v. All Janitorial, et al. as part of the record in this case. Lucio is a related lawsuit filed in federal court against Chaban and All Janitorial for wage and hour violations. Expert represents that it did not include these documents in its initial designation of documents for the record because it had no knowledge of them when filing its brief. Fred Meyer has also submitted two memorandums in support of these motions.

The janitors oppose these motions. But they argue, in the alternative, that they should be allowed to designate additional materials from the Lucio case for the record on appeal.

Because none of the materials that the parties seek to add to the record were before the trial court when it made its two rulings and because there is no persuasive argument why they should be included despite the plain language of RAP 9.12, we deny the motions.

*Striking Portions of Expert's Brief*

In their brief, the janitors moved to strike portions of Expert's brief that reference the Lucio bankruptcy proceedings. Expert responds that the motion is procedurally improper under RAP 10.4(d) and 17.4(d).

We deny the motion to strike. This court is aware of what is properly before us and what is not. We have not considered material that is not properly before us in deciding this case.

## ATTORNEY FEES

The janitors seek an award of attorney fees on appeal, pursuant to RCW 49.46.090 and 49.48.030. Such an award is premature.

RCW 49.46.090 of the MWA and 49.48.030 of the wage statute provide for attorney fees to be awarded to employees' who are successful in recovering judgment for wages owed by employers. Because there has not yet been a final

determination regarding the janitors' claims, we deny their request without prejudice to them seeking fees from the proper court at the proper time.[112]

We reverse the trial court's orders granting summary judgment to both Expert and Fred Meyer and remand for further proceedings.

_Cox, J._

WE CONCUR:

---

[112] See Anfinson, 159 Wn. App. at 73-74 (noting that it was not proper to award attorney fees because "there has been no judgment for wages under the MWA" and no final determination made in the case).